## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JULIA GARCIA, M.D.** | : | **CIVIL ACTION NO.:** |
| 2403 Prairie Rose Lane | : | |
| State College, Pennsylvania 16801, | : | |
| | : | |
| **Plaintiff** | : | _____ |
| | : | |
| | : | |
| | : | **(Judge _____)** |
| | : | |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **ASHLEY RZESZEWSKI** | : | |
| 331 2nd Street | : | |
| Eynon, Pennsylvania 18403, | : | |
| | : | |
| **AND** | : | |
| | : | |
| **POCONO MOUNTAIN REGIONAL** | : | |
| **POLICE COMMISSION** | : | |
| 2454 Route 940 | : | |
| Pocono Summit, Pennsylvania 18346, | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## <u>COMPLAINT</u>

**AND NOW**, comes the Plaintiff, Julia Garcia, M.D., by and through

Counsel, Ryan P. Campbell, Esquire and Dave W. Rothenberg, Esquire of

Rothenberg & Campbell, by way of Complaint against the Defendants, Ashley

Rzeszewski and the Pocono Mountain Regional Police Commission, and hereby complains and avers as follows:

## PRELIMINARY STATEMENT

1.      This action arises from, *inter alia*, Defendants' individual and/or joint violations of 42 U.S.C. § 1983.

2.      Plaintiff brings this action to redress the deprivation of Plaintiff's Constitutional rights as guaranteed under the Fourth and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983.

3.      Defendants, individually, jointly and as officers of the law, did maliciously, intentionally, wantonly, and/or with deliberate indifference, institute or cause to be instituted, criminal proceedings against Plaintiff without probable cause that terminated in Plaintiff's favor resulting in a deprivation of liberties protected under the United States' Constitution; specifically, while vacationing at Kalahari Resort with her minor children, Defendants charged Plaintiff with endangerment of a child when her then-four-year-old son had fallen asleep in the hot tub area, surrounded by his three (3) older siblings.

4.      Plaintiff seeks compensatory, economic, and punitive damages as a result of Defendants' individual and/or joint actions and/or inactions, for damages including, but not limited to, loss of her position as a hospital internist, public shame, and pain-and-suffering.

## THE PARTIES

5.      Plaintiff, Julia Garcia, M.D. (hereinafter referred to as "Plaintiff"), is an adult and competent individual who is a citizen of the Commonwealth of

Pennsylvania with a residence located at 2403 Prairie Rose Lane, State College, Pennsylvania 16801.

6.      At all times material hereto, Plaintiff was a medical physician, licensed to practice family medicine by both the Commonwealth of Pennsylvania and the American Board of Family Medicine, and employed by Penn Highlands Healthcare.

7.      Defendant, Ashley Rzeszewski (hereinafter referred to as "Defendant Rzeszewski"), is believed to be an adult and competent individual, a citizen of the Commonwealth of Pennsylvania with a residence located at 331 2nd St., Eynon, Pennsylvania 18403.

8.      At all times material hereto, Defendant Rzeszewski was employed as a police officer with Defendant, Pocono Mountain Regional Police Commission.

9.      Upon information and belief, Defendant Rzeszewski began her employment with Pocono Mountain Regional Police Department on or about January 6, 2020.

10.     Upon information and belief, Defendant Rzeszewski maintains Officer Badge Number 89 with the Pocono Mountain Regional Police Department.

11.     Upon information and belief, Defendant Rzeszewski obtained an Associate's Degree in Criminal Justice studies, having graduated *magna cum laude* from Lackawanna College in 2020.

12.     At all times material hereto, Defendant Rzeszewski was acting in her capacity as a law enforcement officer with the Pocono Mountain Regional Police Department. Defendant Rzeszewski is being sued in her individual capacity.

13.     Defendant, Pocono Mountain Regional Police Commission (hereinafter referred to as "the Defendant Commission"), is believed to be the police agency

serving the following municipalities located in Monroe County, Pennsylvania: Coolbaugh Township, Mount Pocono Borough, Tobyhanna Township, Tunkhannock Township and Barrett Township.

**14.** Upon information and belief, Defendant Commission is believed to have its primary place of business located at 2454 Route 940, Pocono Summit, Pennsylvania 18346.

**15.** Defendant Commission is believed to be a full-service, law enforcement agency which includes a criminal investigations division, a K-9 division, a narcotics division, a patrol division, a special enforcement division, and a special weapons and tactics division.

**16.** Defendant Commission is believed to serve the five (5) municipalities of the Pocono Mountain Regional Police Department, encompassing approximately 228 square miles and approximately 38% of the total land mass of Monroe County, Pennsylvania.

**17.** Upon information and belief, Defendant Commission serves approximately 43,299 residents of the Commonwealth of Pennsylvania.

**18.** Upon information and belief, Defendant Commission acts as the highest authority of the Pocono Mountain Regional Police organizational hierarchy, maintaining superior discretion over the Chairman, Chief, Operations Lieutenant, Administrative Lieutenant, Sergeants, Corporals and all others with inferior rank, including but not limited to, Defendant Rzeszewski.

## JURISDICTION AND VENUE

**19.** This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives the United States District Courts jurisdiction over all

civil actions arising under the United States Constitution, laws, and treaties of the United States.

**20.**     This Court additionally has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which provides the United States District Courts with original jurisdiction over any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of all citizens or of all persons within the jurisdiction of the United States and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

**21.**     This Court has jurisdiction in that this action involves a Federal Question arising under federal law.

**22.**     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

**23.**     Venue is properly laid in the United States District Court for the Middle District of Pennsylvania because a substantial part of the acts and omissions giving rise to the instant Complaint occurred in Monroe County, Pennsylvania, which is located within the Middle District.

## **FACTUAL BACKGROUND**

**24.**     On or about November 20, 2021, Plaintiff, accompanied by her five (5) minor children, and one (1) additional minor, traveled to Kalahari Resort & Convention Center (hereinafter referred to as "Kalahari") located at 250 Kalahari Blvd., Pocono Manor, Monroe County, Pennsylvania.

25.     The respective ages of the six (6) minors accompanying Plaintiff to Kalahari on November 20, 2021 were ages eleven (11), ten (10), eight (8), six (6), four (4), and one (1).

26.     Plaintiff traveled to Kalahari with the six (6) minor children for the specific purpose of enjoying a family vacation.

27.     At all times material hereto, R.E., Plaintiff's four (4) year old minor child, accompanied Plaintiff to Kalahari and has a date of birth of XX/XX/2017.

28.     At approximately 10:00 a.m. on November 20, 2021, Plaintiff checked into Kalahari's waterpark, and secured a table at or near the indoor pool.

29.     Upon securing the table at Kalahari, Plaintiff ensured that the minor children, and particularly R.E., were all wearing an appropriately sized personal flotation device.

30.     Once secured in their respective personal flotation devices, the Plaintiff's children, including R.E., Plaintiff permitted the children to swim in Kalahari's indoor waterpark at any of the designated areas.

31.     The children, including R.E., ran-off to engage in the multiple pools, slides, and attractions.

32.     At or about 12:00 p.m., the Plaintiff, accompanied by the minor children, visited Kalahari's dining facility located just outside the indoor water park to get lunch for herself and the minor children.

33.     Plaintiff ordered lunch for herself and the minor children and all then returned to Plaintiff's table inside of Kalahari's indoor waterpark.

**34.**     Once the minor children returned to Plaintiff's table with their lunches, Plaintiff's friends supervised them while Plaintiff walked to the bar located inside of Kalahari's indoor water park.

**35.**     Plaintiff ordered one (1) alcoholic margarita for herself and five (5) non-alcoholic margaritas for her children and then immediately returned to the table.

**36.**     Plaintiff drank the alcoholic margarita at approximately 12:00 p.m. on November 20, 2021. [1]

**37.**     After lunch and ensuring that the children, including R.E., were all again wearing the appropriate personal flotation devices, the children returned playing in Kalahari's pools, slides, and attractions while Plaintiff remained at the table.

**38.**     At approximately 4:00 p.m., Plaintiff became aware of a commotion where patrons gathered around and/or near the wave pool located inside of Kalahari's indoor waterpark.

**39.**     Plaintiff, a licensed, board-certified internist, began making her way over to and/or near the wave pool to see if she could be of assistance in the event of a medical emergency.

**40.**     While Plaintiff was walking to the lifeguard's station, she was approached by her three (3) minor children who advised Plaintiff that R.E. had gotten into a hot tub along with three (3) of his siblings inside of Kalahari's indoor waterpark and fallen asleep.

---

[1] An alcoholic margarita contains, on average, approximately .86 ounces (25ml) in alcohol content and is known to have one of the lowest ABV (alcohol-by-volume) percentage of all popular mixed drinks in the United States. See Kerr, C. Thomas, Deidre Petterson, Mary Albert Koenen and Thomas K. Greenfield, *Alcohol Content Variation of Bar and Restaurant Drinks*, National Library of Medicine, National Center for Biotechnology Information, Alcohol Clin. Exp. Res. 2008 Sep; 32(9): 1623-1629. According to the United States' National Institute on Alcohol Abuse and Alcoholism (NIAAA), a typical adult female reaches a blood alcohol concentration of 0.08 (the legal limit to drive in the Commonwealth of Pennsylvania) after imbibing four (4) or more alcoholic beverages. See http://www.niaaa.nih.gov/health-professionals-communities/core-resource-on-alcohol.com

**41.**     Plaintiff, assuming that the commotion and gathering was likely regarding her son, frantically rushed to R.E.'s location.

**42.**     Upon arriving at and/or near the wave pool, the Plaintiff identified her son, R.E., to whom Kalahari's staff and/or personnel was attending.

**43.**     Upon observing her son, R.E., Plaintiff noticed he was conscious and had no trouble breathing.

**44.**     Plaintiff identified herself to Kalahari's staff and personnel as R.E.'s mother and a licensed physician.

**45.**     Notwithstanding Plaintiff's introduction as R.E.'s mother and a physician, Kalahari's staff and personnel told Plaintiff to "stay away."

**46.**     Plaintiff accompanied Kalahari staff and personnel to a designated lifeguard station, where they examined R.E.

**47.**     Once at the designated lifeguard station, Plaintiff immediately noticed that R.E. appeared fine; he was talking, moving, breathing and conscious.

**48.**     Despite R.E.'s obvious signs of stability, Plaintiff followed Kalahari staff and personnel as they removed R.E. from the lifeguard station to a designated side room for further evaluation by emergency medical service technicians.

**49.**     There, emergency medical technicians from Pocono Mountain Regional ("EMS technicians") examined R.E. and checked his vitals.

**50.**     According to the official EMS report, R.E.'s vitals appeared stable and were not elevated and/or heightened.

**51.**     Kalahari staff and personnel questioned Plaintiff while inside of the room wherein R.E. was being evaluated, asking he "what happened," to which Plaintiff

responded that she was putting her newborn baby to sleep while R.E. played with his older siblings in the waterpark.

52.     Kalahari staff and personnel also asked Plaintiff if she had drank any alcohol that day to which Plaintiff replied "a while ago."[2]

53.     Notwithstanding appearing fully alert, responsive, and stable, the EMS technicians demanded R.E. be transported to a hospital for further evaluation.

54.     Plaintiff, relying on her medical expertise, advised the EMS technicians that R.E. did not require urgent medical care, that he had simply fallen asleep and was in need of rest and hydration.  However, Plaintiff did not object to R.E. being transported to the hospital for further evaluation.

55.     As such, Plaintiff gathered her other four (4) children who were present with her at Kalahari, packed up their belongings, and brought them to the hotel where an adult was waiting to supervise the children.

56.     Once Plaintiff arrived with the four (4) children at the hotel room, three (3) of the children were left with a chaperoning adult, and the Plaintiff proceeded to drive along with her newborn child to Lehigh Valley Hospital – Pocono in East Stroudsburg ("LVHN-PO"), where R.E. was taken.

57.     Upon Plaintiff's arrival at LVHN-PO, Plaintiff checked-in at the reception desk and proceeded towards the room wherein R.E. was being evaluated.

58.     While at LVHN-PO, a representative from Monroe County's Children & Youth Services (hereinafter referred to as "CYS") approached Plaintiff and asked her questions about the incident at Kalahari.

---

[2] *To wit*, Plaintiff had one (1) alcoholic margarita approximately four (4) hours earlier. See ¶ 36, *supra*.

**59.**     Plaintiff provided the CYS representative with full, honest and truthful answers to all of the questions presented.

**60.**     After approximately two (2) hours at LVHN-PO, R.E. was discharged without any known diagnosis to the care and custody of Plaintiff.

**61.**     Specifically, the LVHN-PO medical staff advised Plaintiff that it was likely that R.E. had simply overheated and/or fell asleep and that he will need plenty of sleep and hydration to fully recover, the exact same diagnosis and prognosis Plaintiff had advised Kalahari staff and the EMS technicians four hours prior.

**62.**     Plaintiff gathered R.E. and his belongings, brought him to Plaintiff's vehicle, and drove back to the hotel with R.E. and her newborn child to reconvene with the rest of her children, where she arrived without issue.

**63.**     Notwithstanding the preceding events, the Monroe County District Attorney's Office subsequently charged Plaintiff with one (1) count of endangering the welfare of a child, a felony in the second degree, and one (1) count of recklessly endangering another person, a misdemeanor in the second degree.

### The Criminal Complaint and Affidavit of Probable Cause

**64.**     Defendant Rzeszewski filed the Criminal Complaint against Plaintiff on or about December 10, 2021.

**65.**     Defendant Rzeszewski's Criminal Complaint against Plaintiff is riddled with falsehoods and purposeful inaccuracies, alleged by Defendant Rzeszewski for the specific purpose of initiating criminal proceedings against Plaintiff.

66.     For example, Defendant Rzeszewski begins her Affidavit of Probable Cause by claiming, with full knowledge of its falsity, that she responded to Kalahari "for a child *not breathing after drowning*." (*Emphasis added*).

67.     As set forth in the paragraphs of this Complaint, R.E. was *never* in a state of non-breathing, *never* underwater, having worn the protective flotation device, and, importantly, *never* left alone and unsupervised in the hot tub area.

68.     As an additional example of Defendant Rzeszewski's malicious falsehoods set forth in the Affidavit of Probable Cause, Defendant Rzeszewski claims that upon her arrival she spoke with Plaintiff who "was uncooperative with questioning" and admitted to her that Plaintiff drank alcohol earlier that day.

69.     As set forth in the paragraphs of this Complaint, the Plaintiff *never* spoke to Defendant Rzeszewski on November 20, 2021 and *never* admitted to Defendant Rzeszewski that she had consumed alcohol earlier that day.

70.     As yet another example of Defendant Rzeszewski's malicious falsehoods set forth in the Affidavit of Probable Cause, Defendant Rzeszewski claims that upon the emergency medical service personnel's arrival to Kalahari, they determined R.E.'s "vitals were ok *but elevated*." (*Emphasis added*).

71.     As set forth in the paragraphs of this Complaint, the EMS technicians *never* concluded that R.E.'s vitals were elevated; at all times material hereto, R.E.'s recorded vitals were normal and unremarkable.

72.     Another malicious falsehood made by Defendant Rzeszewski in the Affidavit of Probable Cause is the blatantly false statement that "R.E. was in the hot tub *by himself* for approximately [thirty] 30 minutes." (*Emphasis added*).

73.   As set forth in the paragraphs of this Complaint, R.E. was *never* in the hot tub by himself, having been surrounded by his siblings and other individuals.

74.   As an additional example of Defendant Rzeszewski's blatant and malicious falsehoods, and perhaps the most egregious of all, Defendant Rzeszewski states that "[a]t approximately 1900 hours the hospital called me and advised that [Plaintiff] just recently showed up in the waiting room and *drove to the hospital intoxicated with an infant*." (*Emphasis added*).

75.   As set forth in the paragraphs of this Complaint, Plaintiff *never* arrived at the hospital intoxicated, and the hospital's staff *never* contacted Defendant Rzeszewski advising her of such.

76.   Interestingly, Defendant Rzeszewski suggests in her Affidavit of Probable Cause that "[Plaintiff] had an abnormal reaction to her son in a medical emergency."

77.   As aforementioned, Plaintiff is a board-certified, licensed physician and advised Kalahari personnel and the responding emergency medical service technicians that her son, R.E., had simply fallen asleep and/or overheated and was otherwise fine. Plaintiff is clearly qualified to assert such opinion.

78.   However, Defendant Rzeszewski is not a board-certified doctor, and upon information and belief, is not otherwise trained nor licensed in the medical field as a physician. Defendant Rzeszewski is clearly unqualified to categorize R.E.'s falling asleep and/or overheating as a "medical emergency."

79.   Given the above, Defendant Rzeszewski provided false and misleading statements to authorities to conceal the illegal events leading to Plaintiff's impermissible detainment, seizure and/or arrest of Plaintiff.

**80.**     Thus, at minimum, Defendant Rzeszewski's misconduct in supplying the Monroe County District Attorney's Office with knowingly false information, as set forth herein, was a significant cause of Plaintiff's prosecution.

**81.**     Upon information and belief, there were 1,028 complaints made to the Pocono Mountain Regional Police Department in November of 2021, of which 85 resulted in criminal arrests.  Plaintiff's unlawful arrest was one (1) of those 85.

**82.**     Defendant Rzeszewski's Criminal Complaint against Plaintiff requests a warrant of arrest or a summons be issued against Plaintiff, ultimately leading to the initiation of Plaintiff's criminal prosecution.

### The Specific Criminal Charges

**83.**     Plaintiff was charged with: (i) endangering the welfare of a child in violation of 18 Pa. C.S. § 4304(a)(1); and (ii) recklessly endangering another person in violation of 18 Pa. C.S. § 2705; Defendant Rzeszewki signed the affidavit of probable cause.

**84.**     Section 4304(a)(1) provides that a person is guilty of endangering the welfare of a child if "[a] parent, guardian or other person supervising the welfare of a child under [eighteen] 18 years of age ... knowingly endangers the welfare of the child by violating a duty of care, protection or support."  18 Pa. C.S. § 4304(a)(1). [3]

**85.**     Thus, endangering the welfare of a child is a specific intent crime in the Commonwealth of Pennsylvania. *Com. v. Foster*, 764 A.2d 1076 (Super. 2000);

---

[3] "The Pennsylvania courts have established a three-part test that must be satisfied to prove [endangering the welfare of a child: (1) [T]he accused [was] aware of his/her duty to protect the child; (2) [T]he accused [was] aware that the child [was] in circumstances that could threaten the child's physical or psychological welfare; and (3) [T]he accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare." *Commonwealth v. Pahel*, 456. Pa. Super. 159, 689 A.2d 963, 964 (1997).

13

*Com. v. Fewell*, 654 A.2d 1109, 439 (Super. 1995); *Com. v. Cottam*, 616 A.2d 988, 420 (Super. 1992); *Com. v. Cardwell*, 515 A.2d 311, 357 (Super. 1986). [4]

86.     The crime of endangering the welfare of a child has a long-rooted and reputable history in the Commonwealth of Pennsylvania stemming back to 1912 where Judge Mayer Sulzberger professed that "the right of parents to the care and custody of their children is only abridged [and thereby penalized] where they had been guilty of inflicting physical or moral injury upon their offspring with malicious intent." *In re Tony Tuttendario*, 21 Pa. D. R. 561 (1912).

87.     Considering Judge Sulzberger's principles as it pertains to the *mens rea* required, Courts of this Commonwealth have routinely held that the "Commonwealth must prove that the accused is aware of his or her duty to protect the child, that the accused is aware that the child is in circumstances that could threaten the child's physical or psychological welfare, and that the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare." *Com. v. Martir*, 712 A.2d 327 (Super. 1998).

88.     In Commonwealth v. Kemp, the Court found that the defendant could not be convicted as a matter of law, and did not have probable cause to bring the charge of endangering the welfare of a child, where the defendant mother was pregnant and abusing the controlled substance of cocaine. The Court reasoned that the defendant mother, although knowingly pregnant and imminently expecting a baby, did not place the child in danger of death for purposes of

---

[4] With regard to the specific intent contemplated by § 4304, it is the fundamental principle that every parent in the Commonwealth has a general duty of care to their child to avert the child's untimely death. *See Com. v. Foster*, 764 A.2d 1076, Super 2000.

prosecution under Section 4304. *Com. v. Kemp*, 18 Pa. D. & C. 4th, 53, 1992 WL 613723 (1992).

**89.**    In <u>Commonwealth v. Miller</u>, the Court found the defendant mother could not be convicted nor could probable cause be developed pursuant to Section 4304 where the defendant mother believed that her neighbor was tending to her baby, even though the neighbor was not, and even though the defendant "mother exercised poor judgment in believing [the information]." *Com v. Miller*, 600 A.2d 988, 411 Pa. Super. 33 (Super.1992).

**90.**    18 Pa. C.S. § 2705 provides that a person is guilty of the crime of recklessly endangering another person "if he recklessly engages in conduct which places or may place another in danger of death or serious bodily injury." 18 Pa. C.S. § 2705.

**91.**    Recklessly endangering another person "is a crime directed against reckless conduct entailing a serious risk to life or limb out of proportion to any utility the conduct might have." *Com. v. Vogelsong*, 90 A.2d 717 (Super. 2014).

**92.**    Section 2705 provides that a person is guilty of recklessly endangering another person if that person "recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa. C.S. § 2705.

**93.**    The *mens rea* required for recklessly endangering another person is a conscious disregard of a known risk of death or great bodily harm to another person. *Com. v. Hopkins*, 747 A.2d 910 (Super. 2000).

**94.**    The type of parental misconduct contemplated by Section 2705 is enumerated in <u>Commonwealth v. Morrison</u>, where the defendant parents were charged with recklessly endangering another person for intentionally refusing to

bring their six (6) year old child to the hospital for treatment despite known infections to the minor's genitalia thereby risking imminent death or serious bodily injury to the minor. *Com. v. Morrison*, 401 A.2d 1348, 265 Pa. Super. 363 (Super. 1979).

95.     In her Affidavit of Probable Cause, Defendant Rzeszewki sought to support her baseless charges of endangering the welfare of a minor child and recklessly endangering another person against Plaintiff on theories of lack of supervision to R.E., despite the fact that R.E. was with other individuals (and thereby never unsupervised), was at an indoor waterpark wherein safety personnel, including lifeguards, were deployed, and despite Plaintiff having secured R.E. in a personal flotation device as to prevent the risk of death or serious bodily injury.

### The Criminal & Civil Proceedings

96.     On or about December 22, 2021, the Honorable Magisterial District Judge Danielle Travagline arraigned Plaintiff.

97.     Pursuant to Plaintiff's arraignment, Plaintiff was placed on restrictive bail conditions.

98.     Plaintiff was furthermore forced to retain counsel in defending against the two (2) criminal charges.

99.     The charges against Plaintiff and the directives of Defendant Rzeszewki resulted in Child Protective Services issuing an Investigation Report against Plaintiff pursuant to Title 23 Pa. C.S.A. Chapter 63 (the "CYS Report").

100.    The CYS Report initially reported a finding of 'indicated' as it pertains to Plaintiff, based solely upon Defendant Rzeszewki Affidavit of Probable Cause and subsequent criminal charges.

**101.** Plaintiff had to expend significant time and cost in defending against the CYS Report's indicated finding.

**102.** The CYS Report initially resulted in Plaintiff being listed in the Statewide database as a "perpetrator of child abuse" in an indicated report of child abuse.

**103.** After Plaintiff's expending significant time and cost, the CYS Report and its initial "indicated" finding was reversed and later expunged by the Commonwealth of Pennsylvania Department of Human Services, Bureau of Hearings and Appeals on or about July 6, 2023.

**104.** The charges against Plaintiff were the subject of numerous media reports, thereby tarnishing Plaintiff's reputation in the community where she resides and where she practices medicine.

**105.** As a direct and proximate result of Defendants' unlawful crusade against Plaintiff, she lost her employment as a hospital internist.

## The Two (2) Preliminary Hearings

**106.** On February 17, 2022, a Preliminary Hearing was held before the Honorable Senior Magisterial District Judge Ronald W. Swank.

**107.** At the time of the Preliminary Hearing, the Commonwealth of Pennsylvania was represented by Michael Tomcho, Esquire, an Assistant District Attorney employed by the Monroe County District Attorney's Office.

**108.** The Commonwealth called, Mark Lambert, director of security for Kalahari, as its first witness who testified on direct examination that Kalahari preserved, and provided to the Pocono Mountain Regional Police Department, surveillance camera footage captured from inside of Kalahari's indoor waterpark at approximately 3:58 p.m. on November 20, 2021.

**109.**   On cross-examination, Mr. Lambert testified that the hot tub wherein the above-described incident involving R.E. occurred is an outdoor hot tub that is connected to the interior pool deck via a passageway that permits patrons ingress and egress.

**110.**   Significantly, Mr. Lambert further testified that "there are no chairs" situated around the outdoor hot tub and there's therefore "no place for anybody who may be watching a child or watching other people in there to be sitting outside of that hot tub."

**111.**   Additionally, Mr. Lambert testified that at the time of the above-described incident involving R.E., there were multiple other people in the hot tub along with R.E.

**112.**   Lastly, Mr. Lambert testified that there are no boundaries stopping somebody, including a child, from going to one pool, designated exclusively for children, to another pool, designated exclusively to adults. To the contrary, the only mechanism employed by Kalahari to distinguish the 'child-only' areas from the 'adult-only' areas is signage. There were no lifeguards stationed at or near the hot tub in question.

**113.**   The Commonwealth then called its second witness, Juan Castellano, a Kalahari waterpark lifeguard that was stationed at the wave pool at the time of the above-described incident involving R.E., who, at that time, had been employed and/or certified as a lifeguard for less than two (2) months.

**114.**   Mr. Castellano testified that during his shift on November 20, 2021, a little girl approached him at his lifeguard station with a minor-boy, R.E., who appeared injured.

**115.** Mr. Castellano testified that upon being brought R.E., he immediately activated the EAP (emergency action plan) by blowing four (4) whistles, thereby summoning additional personnel to respond to the scene.

**116.** Mr. Castellano testified that a crowd quickly formed around the lifeguard station wherein R.E. had been brought, including at least one (1) female individual, unknown by name to Mr. Castellano, who had declared that she was a doctor, and specifically, a pediatrician.

**117.** Mr. Castellano continued his testimony by stating that R.E. was in his care for less than one (1) minute before R.E. was transferred to the EMS room.

**118.** Importantly, Mr. Castellano testified that despite his employment with Kalahari for only two (2) months, he has seen other minor children get into this particular hot tub. Specifically, Mr. Castellano recalled that "little kids constantly go in and out from the hot tub to the wave pool."

**119.** As it pertains to R.E., Mr. Castellano testified that, based upon his training and experience, he believed that R.E. had simply overheated.

**120.** Prior to the conclusion of the Commonwealth's case-in-chief, the Defendant, Ashley Rzeszewski, was sworn in to testify on behalf of the Commonwealth.

**121.** Defendant Rzeszewski began her testimony by stating that she responded to a dispatch operator's call "for a [sic] unconscious child possibly from a drowning incident" and described the gravity of the situation as "severe."

**122.** Defendant Rzeszewski proceeded to testify that upon her arrival, R.E. was laying down while hooked-up to medical equipment to monitor R.E.'s vital signs, surrounded by multiple Kalahari employees, the Plaintiff and EMS technicians.

**123.**   Defendant Rzeszewski testified that the first person she spoke with upon her arrival in responding to a situation that she described as "severe", was the Plaintiff.

**124.**   Furthermore, Defendant Rzeszewski testified that in her initial conversation with Plaintiff, while R.E. was being treated by EMS personnel, Defendant Rzeszewski asked Plaintiff "if she was drinking" and Plaintiff responded by saying "some."

**125.**   Defendant Rzeszewski elaborated on Plaintiff's alleged answer by claiming that Plaintiff stated that she "only had a little [to drink]."

**126.**   Defendant Rzeszewski admitted that she did not perform any standard field sobriety tests, or any alco-sensor or handheld alcohol sensor tests on Plaintiff nor did Plaintiff tell her what she had to drink or when.

**127.**   Defendant Rzeszewski then testified to a video purportedly captured by Kalahari video surveillance which shows Plaintiff at a Kalahari bar located at or near Kalahari's indoor pool at approximately 12:01 p.m. and leaving said bar at approximately 12:02 p.m.

**128.**   Defendant Rzeszewski conceded that although she can identify Plaintiff at the aforementioned bar, she had no idea what it was that Plaintiff ordered and acknowledged that it is not an 'alcohol-only' bar but in-fact offers non-alcoholic "kid drinks" as well.

**129.**   Defendant Rzeszewski acknowledged that Plaintiff was at Kalahari with multiple children, although she did not try and ascertain how many as part of her investigation, and further acknowledged that R.E. was with older children while

in the hot tub, including a female (later identified as R.E.'s sister), as well as "lots of adults" in that same hot tub.

**130.**   Defendant Rzeszewski testified that during the course of her investigation, she had become aware that R.E. was wearing a personal flotation device (a life vest) that was properly secured to R.E.

**131.**   Despite her repeated baseless allegations that Plaintiff was "intoxicated", Defendant Rzeszewski never charged Plaintiff with driving under the influence or public intoxication[5], despite her testimony that Plaintiff drove to the hospital wherein R.E. was being treated and that the hospital released R.E. to Plaintiff so that Plaintiff could then drive R.E. back to the hotel.

**132.**   Extraordinarily, Defendant Rzeszewski testified, as echoed in her Affidavit of Probable Cause, that "at approximately 1900 hours, 7 p.m., the hospital called [Defendant Rzeszewski] and told [Defendant Rzeszewski] that [Plaintiff] had just recently showed up in the waiting room and drove to the hospital intoxicated with an infant."

**133.**   However, and despite her baseless allegations of intoxication, and further despite her blatant fabrication that the hospital called her, Defendant Rzeszewski admitted that "it would be ***criminally negligent*** for the hospital to allow [Plaintiff] to drive away from that hospital, with her two children, [had she been intoxicated]." (***Emphasis added***).

**134.**   After the conclusion of Defendant Rzeszewski's testimony, the Commonwealth rested and the Defense waived its case-in-chief and instead

---

[5] Upon information and belief, the Defendant Commission maintained an internal directive known and/or referred to as "General Order No. 8-3" and entitled "Vehicle Enforcement Action" which authorized police officers, such as Defendant Rzeszewski, to arrest an individual who is believed to be in violation of the traffic laws of this Commonwealth pertaining to driving under the influence of alcohol.

offered argument for dismissal of all criminal charges based upon the Commonwealth's inability to prove a *prima facie* case.

**135.**  At that time, Magistrate Swank issued an Order dismissing all charges against Plaintiff for the Commonwealth's inability to prove a *prima facie* case.

**136.**  Despite Magistrate Swank's ruling and upon the directive of Defendant Rzeszewski, the Commonwealth recharged Plaintiff with the ***same exact*** criminal offenses with the ***same exact*** evidence about four (4) months later, thereby necessitating a second preliminary hearing.

**137.**  This time, the Commonwealth caused the second Preliminary Hearing to be conducted by the Honorable Magisterial District Judge Michael R. Muth, which was scheduled for June 14, 2022, where the Commonwealth presented no live witnesses.

**138.**  Specifically, ADA Tomcho, Mr. Lambert, Mr. Castellano, and Defendant Rzeszewski were ***not physically present*** at the second Preliminary Hearing.

**139.**  At the June 14, 2022 Preliminary Hearing, the Commonwealth presented Magistrate Muth with the transcripts and evidence from the first Preliminary Hearing, and requested that the Court "make a decision based on the evidence that was already submitted at the previous preliminary hearing."

**140.**  The Commonwealth, by and through the directives of Defendant Rzeszewski, simply asked Magistrate Muth to come to a different conclusion based on the same evidence and testimony presented at the first Preliminary Hearing, despite the obvious lack of probable cause and despite Magistrate Swank's Order.

**141.**  On June 15, 2022, Magistrate Muth issued an Order ***once again*** dismissing the charges against Plaintiff due to the Commonwealth's evidentiary failures.

## COUNT I: MALICIOUS PROSECUTION
### (42 U.S.C. § 1983)
### PLAINTIFF v. DEFENDANT RZESZEWSKI

**142.** Plaintiff reavers and realleges Paragraphs 1-141 as though more fully set forth at length herein.

**143.** 42 U.S.C. § 1983 sets forth, in part:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983.

**144.** At all times material hereto, Defendant Rzeszewski, is a person within the meaning of 42 U.S.C. § 1983.

**145.** Defendant Rzeszewski conspired to initiate criminal proceedings against Plaintiff, resulting in a warrant for her arrest and prosecution.

**146.** Defendant Rzeszewski initiated such criminal proceedings against Plaintiff with malice, deliberate indifference and/or for an improper purpose.

**147.** The criminal proceedings terminated in favor of Plaintiff.

**148.** Defendant Rzeszewski's initiation of the criminal proceedings against Plaintiff proximately caused the damages and injuries Plaintiff sustained.

**149.** Defendant Rzeszewski physically seized Plaintiff and/or caused Plaintiff to be physically seized.

**150.**   As set forth by the Supreme Court of the United States, a seizure occurs when there is a governmental termination of freedom of movement through means intentionally applied. *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989).

**151.**   Defendant Rzeszewski's conduct therefore was a deprivation, under color of state law, of rights guaranteed to Plaintiff pursuant to the Fourth and Fourteenth Amendments of the United States Constitution.

**152.**   As the direct result of Defendant Rzeszewski violations of Plaintiff's Constitutional rights, Plaintiff suffered serious, substantial and permanent injuries and damage.

**WHEREFORE,** the Plaintiff, Julia Garcia, M.D., respectfully demands Judgment against the Defendant, Ashley Rzeszewki, in an amount in excess of the mandatory arbitrational jurisdictional limits of this Honorable Court.

### COUNT II: FALSE ARREST
### (42 U.S.C. § 1983)
### PLAINTIFF v. DEFENDANT RZESZEWSKI

**153.**   Plaintiff reavers and realleges Paragraphs 1-152 as though more fully set forth at length herein.

**154.**   42 U.S.C. § 1983 sets forth, in part:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983.

**155.**   At all times material hereto, Defendant Rzeszewski, is a person within the meaning of 42 U.S.C. § 1983.

**156.**   Defendant Rzeszewski conspired to, and did arrest, detain and/or seize Plaintiff without probable cause, in violation of Plaintiff's rights guaranteed to Plaintiff and vested in the Fourth and Fourteenth Amendments of the United States Constitution.

**157.**   Defendant Rzeszewski's conduct was therefore a deprivation, under color of state law, of rights guaranteed to Plaintiff under the Fourth and Fourteenth Amendments to the United States Constitution.

**158.**    As the direct and proximate result of Defendant Rzeszewski violations of Plaintiff's Constitutional rights, Plaintiff suffered serious, substantial and permanent injuries and damage.

      **WHEREFORE,** the Plaintiff, Julia Garcia, M.D., respectfully demands Judgment against the Defendant, Ashley Rzeszewki, in an amount in excess of the mandatory arbitrational jurisdictional limits of this Honorable Court.

### COUNT III: ABUSE OF PROCESS
### (42 U.S.C. § 1983)
### PLAINTIFF v. DEFENDANT RZESZEWSKI

**159.**   The Plaintiff reavers and realleges ¶ 1-158 as though more fully set forth at length herein.

**160.**   Defendant Rzeszewski utilized the criminal legal process against Plaintiff to charge her with crimes wholly unsupported by probable cause.

**161.**   Defendant Rzeszewski's purpose in utilizing the criminal justice process was primarily to accomplish a purpose for which it was not designed. *To wit,*

Defendant Rzeszewski's purpose was to unlawfully arrest and charge Plaintiff in an attempt to intimidate, harass, annoy, and alarm her.

162.   Defendant Rzeszewski's abuse of the legal process proximately and directly caused Plaintiff serious, substantial and permanent injuries and damage.

**WHEREFORE,** the Plaintiff, Julia Garcia, M.D., respectfully demands Judgment against the Defendant, Ashley Rzeszewki, in an amount in excess of the mandatory arbitrational jurisdictional limits of this Honorable Court.

<u>**COUNT IV: FAILURE TO TRAIN**</u>
<u>**(42 U.S.C. § 1983)**</u>
**PLAINTIFF v. THE DEFENDANT COMMISSION**

163.   Plaintiff reavers and realleges ¶ 1-162 as though more fully set forth at length herein.

164.   The Supreme Court of the United States has declared that a municipality is liable if its policies, practices, and/or customs are the moving force behind the deprivation of an individual's Constitutional rights. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978)

165.   Thus, a supervising authority is liable pursuant to 42 U.S.C. § 1983 for failing to train police officers "when the failure to train demonstrates deliberate indifference to the constitutional rights of those with whom the officers may come into contact." *Gilles v. Davis*, 427 F.3d 197, 207 n.7 (3d Cir. 2005).

166.   Deliberate indifference to a particular training need may be established where a policymaker has knowledge of a "pattern of similar constitutional violations by untrained employees" but takes no action to augment or otherwise alter the employee training programs accordingly. *See Lapella v. City of Atl. Cty.*, No. 10-2454, 2012 WL 2952411 at *7 (D.N.J. July 18, 2012) *(citing Connick v.*

*Thompson*, 131 S.Ct. 1350, 1360 (2011)); *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3rd. Cir. 1990).

**167.** Defendant Commission was deliberately indifferent to the fact that violations of the Fourth and Fourteenth Amendments of the United States Constitution is a highly predictable and likely consequence of the Defendant Commission's failure to adequately train its police officers, and specifically Defendant Rzeszewski.

**168.** Defendant Commission maintained, tolerated, permitted, and acquiesced in polices, practices and customs that *inter alia* subjected persons, such as the Plaintiff, to unlawful seizures and false arrests among other dangerous and unlawful violations of individuals' constitutional rights.

**169.** These policies, practices, and customs were the moving force that resulted in Plaintiff's constitutional and statutory rights being violated, thereby causing Plaintiff to sustain serious, substantial and permanent injuries and damage.

**170.** The deficiency of the Defendant Commission's training program and supervision was closely related to, and the direct and proximate result of, the Plaintiff's serious, substantial and permanent injuries and damage.

**171.** Defendant Commission knew of a pattern of similar constitutional violations to those referenced herein, by improperly trained and improperly supervised employees, such as Defendant Rzeszewski, but was deliberately indifferent to the fact that the inadequate training and supervision was likely to cause injury and/or damage to others individuals, such as the Plaintiff.

**172.** Defendant Commission condones and/or encouraged officers within the Pocono Mountain Regional Police Department in the belief that violations of the

rights, privileges and immunities of persons would not be deemed a dereliction of duty or in violation of the sworn oath of police officers within the Commonwealth of Pennsylvania, and that such conduct would not, and will not, adversely affect those officers' opportunities for promotion and/or other employment benefits.

173.   Defendant Commission's actions and/or omissions were conducted and/or not conducted with deliberate indifference, gross negligence and reckless disregard for the safety, security, and Constitutional rights of persons, such as the Plaintiff.

174.   It is believed, and therefore averred, that the Defendant Commission knew of Defendant Rzeszewski's multiple and repeated violations of persons' Constitutional rights prior to her violations of Plaintiff's Constitutional rights, as set forth herein, and that the Defendant Commission condoned and/or encouraged Defendant Rzeszewski in the belief that violations of the rights, privileges and immunities of persons would not be deemed a dereliction of duty or in violation of Defendant Rzeszewski's sworn oath as a police officers within the Commonwealth of Pennsylvania, and that such conduct would not, and ultimately did not, adversely affect Defendant Rzeszewski's opportunities for promotion and/or other employment benefits.

175.   Upon information and belief, the Defendant Commission was previously made aware of Defendant Rzeszewski's multiple Constitutional violations prior to the incident giving rise to the instant action, and in particular Defendant Rzeszewski's Constitutional violations that occurred on or about May 2, 2021.

176.   Upon information and belief, the Defendant Commission knew that Defendant Rzeszewski was violating persons' Constitutional rights in her capacity

as a police officer with the Pocono Mountain Regional Police Department, and specifically knew that Defendant Rzeszewski's Constitutional violations included arresting individuals without probable cause of justification and providing falsehoods to authorities that are entirely unsupported by evidence. *See, e.g., Barnello v. Pocono Mountain Regional Police Commission*, 3:23-cv-00116, M.D. Pa. 2023.

**177.**   Plaintiff has a good faith belief that at least one (1) member of the public has provided formal complaints to the Defendant Commission regarding inadequacy and/or lack of officer training, including but not limited to, on December 14, 2021.

**178.**   Defendant Commission's knowledge of the likelihood that Defendant Rzeszewski's further violations would recur and the predictability that Defendant Rzeszewski's lack of specific tools and training would violate additional persons' Constitutional rights, accompanied by the Defendant Commission's purposeful decision not to provide the requisite training to Defendant Rzeszewski reflects upon the Defendant Commission's deliberate indifference to the obvious consequences of its choice, namely violations of persons', such as the Plaintiff's, Constitutionally protected rights.

**WHEREFORE,** the Plaintiff, Julia Garcia, M.D., respectfully demands Judgment against the Defendant, Pocono Mountain Regional Police Commission, in an amount in excess of the mandatory arbitrational jurisdictional limits of this Honorable Court.

## COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (42 U.S.C. § 1983)
### PLAINTIFF v. ALL DEFENDANTS

**179.**   Plaintiff reavers and realleges ¶ 1-178 as though more fully set forth at length herein.

**180.**   Defendants, Ashley Rzeszewski and Pocono Mountain Regional Police Commission, owed Plaintiff a pre-existing and/or fiduciary duty to be free from unlawful seizure.

**181.**   Plaintiff has suffered and continues to suffer physically and mentally from the obvious failure of the Defendants as set forth herein.

**182.**   Defendants repeatedly and continuously put Plaintiff in danger by arresting her without probable cause, thereby seizing her, and by providing known falsehoods to authorities for the specific purpose of attempting to unlawfully develop probable cause, all with the Defendant Commission's knowledge and approval of same.

**183.**   Defendants, by and through their extreme and outrageous conduct, as set forth herein, intentionally and/or recklessly caused Plaintiff to suffer severe emotional distress.

**184.**   Commission Defendant deliberately failed to intervene in Defendant Rzeszewski's ongoing Constitutional violations by failing and/or refusing to provide requisite training to Defendant Rzeszewski.

**185.**   By creating known falsehoods about Plaintiff, Defendant Rzeszewski, with full knowledge that her deception was causing Plaintiff to sustain significant damage and injury, including severe emotional distress, engaged in conduct that was extreme, outrageous, wanton and malicious.

**186.**   The Defendants' actions and/or inactions, as set forth herein, were intentional and in spite of the Plaintiff's rights as guaranteed by the United States Constitution and further in spite of the wellbeing and safety of the Plaintiff.

**187.**   The Defendants' conduct, as set forth herein, was so outrageous in character and so extreme in degree as to fall outside the bounds of decency and needs to be regarded as intolerable in any community within the United States of America.

**188.**   Thus, the Defendants caused severe emotional distress to the Plaintiff by their intentional actions and/or their deliberate indifference to the Constitutional rights, privileges, and immunities of the Plaintiff.

**WHEREFORE,** the Plaintiff, Julia Garcia, M.D., respectfully demands Judgment against the Defendants, Ashley Rzeszewski and Pocono Mountain Regional Police Commission, either individually and/or jointly, in an amount in excess of the mandatory arbitrational jurisdictional limits of this Honorable Court.

## RELIEF REQUESTED

**189.**   Plaintiff reavers and realleges ¶ 1-188 as though more fully set forth at length herein.

**190.**   As direct and proximate causes for Counts I – V listed above, Defendants, either individually and/or jointly, caused Plaintiff to incur pain and suffering, loss of her employment, personal pain and suffering related to damage to her professional reputation, significant time, costs and expenses related to defending against the frivolous, unlawful criminal actions and other specific damages outlined herein.

**191.**   Plaintiff, Julia Garcia, M.D., respectfully requests this Honorable Court issue judgment against the Defendants, Ashley Rzeszewski and Pocono Mountain Regional Police Commission, either individually and/or jointly, including the following:

    **a.**   An award to Plaintiff of compensatory, consequential, punitive and statutory damages;

    **b.**   An award of attorneys' fees, costs and expenses as provided by law or equity;

    **c.**   An award of pre-judgment and post-judgment interest, as provided by law or equity; and

    **d.**   Such other relief as this Honorable Court deems appropriate and equitable.

        Respectfully Submitted,

        **ROTHENBERG & CAMPBELL**

BY:

Ryan P. Campbell, Esq.
345 Wyoming Ave., Ste. 210
Scranton, PA 18503
P: 570.207.2889
E: HRLaw04@gmail.com

Dave W. Rothenberg, Esq.
345 Wyoming Ave., Ste. 210
Scranton, PA 18503
P: 570.207.2889
E: HRLaw06@gmail.com

*Attorneys for the Plaintiff,*
*Julia Garcia, M.D.*

Dated: December 4, 2023.