## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JULIA GARCIA, M.D., | : | No. 3:23-CV-1992 |
| | : | |
| Plaintiff, | : | (Caraballo, M.J.) |
| | : | |
| v. | : | |
| | : | |
| ASHLEY RZESZEWSKI and | : | |
| POCONO MOUNTAIN | : | |
| REGIONAL POLICE | : | |
| COMMISSION, | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

### I.    Introduction

On December 12, 2023, plaintiff Julia Garcia, M.D., initiated this civil rights and tort action against defendants Ashley Rzeszewski and the Pocono Mountain Regional Police Commission (collectively, the "Defendants"). Doc. 1. Before the Court are Dr. Garcia's five claims for malicious prosecution, false arrest, abuse of process, failure to train, and intentional infliction of emotional distress. Doc. 1 at 23–31. The Court has federal question and supplemental jurisdiction pursuant to Title 28, United States Code, Sections 636(c), 1331, 1343, and 1367.

On March 14, 2025, the Defendants moved for summary judgement on all five claims. Doc. 23. Dr. Garcia filed a timely opposition on April 4, 2025. Doc. 33. Following oral argument, the motion is now fully briefed and ripe for decision. For the reasons set forth below, the Court will deny summary judgment on Dr. Garcia's claims for malicious prosecution and false arrest against Officer Rzeszewski. The Court, however, will grant summary judgment and dismiss Dr. Garcia's claims for abuse of process, failure to train, and intentional infliction of emotional distress against Officer Rzeszewski and the Pocono Mountain Regional Police Commission ("Pocono Mountain"), and dismiss Pocono Mountain from this action.

## II.   Background

### A.   Relevant Procedural History

Dr. Garcia is a board-certified physician who practiced family medicine in Pennsylvania, and is the mother of five children. Doc. 32 at 2. In 2021, the Monroe County District Attorney's Office brought two failed prosecutions against Dr. Garcia for allegedly endangering the wellbeing of her then four-year-old child, "R.E." *Id.* at 4; Doc. 33-14 at 5; Doc. 33-15 at 1; Doc. 1 at 13. The charges lodged against Dr. Garcia

2

were premised on an affidavit of probable cause prepared and signed by defendant Rzeszewski, who, at the time, was a Police Officer in the Pocono Mountain Regional Police Department. Doc. 32 at 4; Doc. 33-10 at 2–6.

Dr. Garcia consequently filed this action against the Defendants on December 4, 2023. Doc. 1. In her complaint, Dr. Garcia asserts five claims under 42 U.S.C. § 1983 and Pennsylvania state law for: (1) malicious prosecution (against Officer Rzeszewski); (2) false arrest (against Officer Rzeszewski); (3) abuse of process (against Officer Rzeszewski); (4) failure to train (against Pocono Mountain); and (5) intentional infliction of emotional distress (against both Defendants). Doc. 1 at 23–31. All five claims are premised on allegations that Officer Rzeszewski knowingly and intentionally pursued criminal charges against Dr. Garcia without probable cause. *Id.* at 5–31.

The Defendants filed their answer on January 14, 2024, asserting the affirmative defenses of, among others, failure to state a claim and immunity. Doc. 10 at 8–18. On March 14, 2025, after the close of discovery, the Defendants filed a motion for summary judgment. Doc. 23. The Defendants contend that they are entitled to summary

3

judgment on all claims. *Id.* at 1–4. Specifically, they aver that Officer Rzeszewski had probable cause to charge and arrest Dr. Garcia, Dr. Garcia was not seized, Dr. Garcia has not produced sufficient evidence to establish her abuse of process, failure to train, or intentional infliction of emotional distress claims, and that Officer Rzeszewski is shielded by qualified immunity. Doc. 26 at 11–33.[1]

Dr. Garcia filed an opposition to the motion for summary judgment on April 4, 2025. Doc. 33. She contends that she produced sufficient evidence to proceed to trial on her claims for failure to train and intentional infliction of emotional distress, that Officer Rzeszewski is not entitled to qualified immunity, that the evidence shows Dr. Garcia was seized, and that Officer Rzeszewski charged Dr. Garcia despite knowing of the absence of probable cause. *Id.* at 8–21. The Court held oral argument on the motion on March 4, 2026. Doc. 39.

---

[1] The Defendants' filings fail to comply with this Court's local rules. In particular, their brief exceeds the 15-page, 15,000-word limitation set forth in Local Rule 7.8(b), without having sought prior authorization from the Court via motion. Likewise, the motion and brief lack a certificate of word count, a table of contents, and a table of authorities. *See* M.D. Pa. L.Rs. 7.1, 7.8(a). Counsel is advised to comply with all local rules in future filings, or risk adverse action.

## B.    Factual Background

The parties offer conflicting accounts of the underlying facts leading to Dr. Garcia's prosecution, with material differences noted herein. On the morning of November 20, 2021, Dr. Garcia, accompanied by her five minor children and one additional minor, attended the Kalahari Waterpark in Pocono Manor, Pennsylvania. Doc. 1 at 5; Doc. 27 at 2; Doc. 33 at 2. They were joined at the waterpark by Tristin Largey, her minor child and one additional minor. Doc. 27 at 2; Doc. 33 at 2. The Defendants aver that Dr. Garcia "admitted drinking alcoholic beverages starting at noon," Doc. 27 at 2, while she counters that she drank only "part of one (1) margarita at lunch between the hours of 12 p.m. and 2 p.m." Doc. 32 at 4.

At approximately 4:00 p.m., Dr. Garcia's four-year-old child, R.E., while out of her sight, was removed from the waterpark's hot tub after a medical incident. Doc. 1 at 7; Doc. 27 at 2; Doc. 32 at 16. The parties dispute the nature of R.E.'s medical episode in the hot tub and whether he was unsupervised. The Defendants contend that Dr. Garcia's lack of direct supervision over R.E. rendered him unsupervised when he entered the hot tub, where he "passed out" before being attended by

5

Kalahari lifeguards. Doc. 26 at 2; Doc. 27 at 2. Dr. Garcia, by contrast, denies that R.E. was unsupervised, because he was in the presence of over 40 individuals located within the hot tub, including his older sisters. Doc. 32 at 2; Doc. 33 at 9–10. Further, she contends that R.E. did not pass out, but fell asleep in the hot tub, and was fully conscious when brought to Kalahari lifeguards, with contemporaneous medical records listing him as oriented with no abnormalities, alert, conscious, and answering questions. Doc. 32 at 3; Doc. 33 at 9–10.

Subsequent to his medical episode, R.E's sisters removed him from the hot tub and presented him to a lifeguard stand, where Kalahari medical staff tended to R.E. and phoned local emergency services for additional help. Doc. 1 at 8; Doc. 27 at 2; Doc. 32 at 2–3, 16. This call led to the dispatch of Pocono Mountain Regional Emergency Medical Services ("EMS") and Officer Rzeszewski, a member of the Pocono Mountain Regional Police Department. Doc. 27 at 2, 5; Doc. 32 at 3, 7.

Soon after being alerted to R.E.'s condition, Dr. Garcia arrived at the lifeguard stand, identified herself as a physician and R.E.'s mother, and sought to intervene. Doc. 1 at 8; Doc. 27 at 5–7; Doc. 32 at 7–9. Kalahari staff responded by telling Dr. Garcia not to interfere, and she

6

complied by standing to the side. Doc. 27 at 7–8; Doc. 32 at 9–10. Kalahari medical staff then removed R.E. to the Kalahari EMS office for further evaluation and treatment, accompanied by Dr. Garcia. Doc. 27 at 2; Doc, 32 at 3.

After the parties relocated to the EMS office, Officer Rzeszewski arrived at the scene and joined them. Doc. 27 at 2; Doc. 32 at 3, 6. Medical staff communicated to Dr. Garcia their view that R.E. needed to be transported via ambulance to the hospital. Doc. 27 at 6; Doc. 32 at 8, 10. Dr. Garcia voiced her disagreement with this conclusion, and indicated that she could instead treat him at home. Doc. 27 at 6, 8; Doc. 32 at 8, 10. Dr. Garcia alternatively offered to drive R.E. to the hospital herself. Doc. 27 at 8; Doc. 32 at 10.

The parties dispute the tone and tenor of Dr. Garcia's interaction with medical staff and Officer Rzeszewski while in the Kalahari EMS office. The Defendants contend that Dr. Garcia was "disruptive," emphasizing her opposition to R.E. going to the hospital, her opposition to transporting R.E. by ambulance, and an exchange with Officer Rzeszewski in which Dr. Garcia was told that EMS personnel needed to do their job. Doc. 27 at 3, 5. The Defendants further cite an affidavit by

7

one of the Kalahari EMS workers that describes Dr. Garcia as argumentative with staff despite the general consensus that R.E. needed to go to the hospital, as possibly inebriated, and as slurring her words and stumbling. *Id.* at 5–6. Officer Rzeszewski also suspected Dr. Garcia of being under the influence of alcohol. Doc. 27 at 3.

Dr. Garcia, however, claims that "she participated in the evaluation of her son," "thought [she] was part of the team[,]" and only ever communicated to staff that, in her professional opinion as a physician, R.E. did not need to go to the hospital because his vitals were stable. Doc. 32 at 8. She maintains, moreover, that she did not oppose R.E. going to the hospital in an ambulance, and simply advised that she would transport him herself, a position which she later abandoned. *Id.* She also denies having been inebriated, slurring her words, or stumbling, and cites the affidavit of her friend, Tristin Largey, in support. *Id.* Finally, Dr. Garcia refutes that medical staff reached a general consensus that R.E. needed to go to the hospital, because she, as the "highest-ranking medical professional at the scene," came to a different conclusion. *Id.*

8

Dr. Garcia ultimately acceded to R.E. being transported to the hospital by ambulance. Doc. 27 at 6; Doc. 32 at 8. Dr. Garcia did not, however, ride with R.E., but traveled separately and arrived later. Doc. 27 at 8; Doc. 32 at 10. Once R.E.'s treatment at the hospital concluded, Dr. Garcia was not allowed to leave with him until the hospital "cleared" her departure with Monroe County's Children and Youth Services ("CYS"). Doc. 27 at 8; Doc. 33 at 11. While the parties dispute whether CYS required Dr. Garcia's husband to come to the hospital before allowing R.E.'s release, they agree that the hospital would not release R.E. to Dr. Garcia without clearance from CYS. Doc. 27 at 8; Doc. 32 at 10–11.

After the events at Kalahari, Officer Rzeszewski prepared an affidavit of probable cause to charge Dr. Garcia with criminal offenses arising out of the incident. Doc. 27 at 3–5; Doc. 33 at 4–6. On December 10, 2021, Officer Rzeszewski filed charges against Dr. Garcia for endangering the welfare of a child under 18 Pa. C.S. § 4304(a)(1), a felony offense, and recklessly endangering another person under 18 Pa. C.S. § 2705, a misdemeanor. Doc. 27 at 3–5; Doc. 33 at 4–6. Prior to filing charges, Officer Rzeszewski reviewed the charges and affidavit of

9

probable cause with her supervisor, and with Monroe County Assistant District Attorney Matthew Bernal, the latter of whom verbally approved the charges. Doc. 27 at 3–4; Doc. 32 at 5–6.

The factual disagreements between the parties extend to the representations made by Officer Rzeszewski in her affidavit of probable cause. Dr. Garcia contends generally that Officer Rzeszewski, in constructing the affidavit, knowingly omitted and misrepresented certain material facts that formed the key premises in warranting criminal charges. Doc. 33 at 11–12. Importantly, Dr. Garcia claims that absent this alleged malfeasance, she would not have been charged. *Id.* at 12. By contrast, the Defendants contend that the evidence supports Officer Rzeszewski's representations in the affidavit, and that, viewed in their totality, Officer Rzeszewski had probable cause to charge Dr. Garcia. Doc. 26 at 14–15. The Defendants also emphasize that Officer Rzeszewski's supervisor and ADA Bernal both agreed with charging Dr. Garcia. *Id.* at 15.

The affidavit of probable cause states:

On 11/20/2021 at 1605 hours I, Officer Ashley Rzeszewski, responded to a dispatch at Kalahari for a child not breathing after drowning. While arriving on scene Control Center advised the child was responsive and breathing.

10

I arrived on scene at 1609 hours and made contact with the patient in the EMS office identified as R.E. and his mom Julia Garcia. R.E. was being treated by Kalahari EMS. He was on oxygen and responding to questions.

I spoke with Julia. I asked Julia what happened and she was uncooperative with questioning. She just kept saying that she's a physician and the child is fine. I advised her that EMS needs to do their job and paramedics were on their way. I asked if she had any alcohol tonight and she stated "yes but awhile [sic] ago." I asked how much and she said "some." Julia was slurring her speech and was zoned out. She was starring [sic] at the ground not really paying attention to her child. She had an abnormal reaction to her son in a medical emergency.

Pocono Mountain Regional EMS (PMREMS) arrived and started treating R.E. They advised that his vitals were okay but elevated.

Security advised that the child was in the far left hot tub of the waterpark in the outdoor portion, with three other little girls looking approximately 10-11 years old. They are playing in the hot tub when you can see R.E.'s head fall backwards. The little girls swim over to him and one girl, later identified as his sister, picks him up and the other girls are shaking his head trying to wake him up. The sister carries him out and walks him over to the lifeguard at the wave pool. The lifeguard grabs the child and is seen blowing her whistle holding her arm up. A few seconds later you see R.E. go limp in her arms and she puts him on the ground to start life saving measures. A crowd of people form around her and R.E. A few minutes go by and Julia is seen running by the crowd of people. She stops and backtracks and realizes it was her son. She stood back off to the side. Kalahari EMS arrive and took over care for R.E. While R.E. was in the hot tub unsupervised buy [sic] an adult, Julia was sitting at a table with another

11

adult at the other end of the waterpark. The hot tub R.E. was in was not in sight of where Julia was sitting.

R.E. was in the hot tub by himself for approximately 30 minutes.

The hot tub is posted that no lifeguard is on duty, it is not recommended for anyone under the age of 6, and should be used in only 15 minute increments.

Julia was refusing to allow PMREMS to transport R.E. EMS called medical command and medical command stated the child needed to be transported due to not knowing why the child passed out and the vitals being elevated. Julia insisted she knew what she was talking about and would treat R.E. in her own office when they return home in a couple days. EMS advised her that she did not have a choice he needed to go and she eventually agreed but advised she would not be going with the child. She stated she would go to the hospital "later."

PMREMS transported R.E. to Lehigh Valley Pocono.

At approximately 1900 hours the hospital called me and advised that Julia just recently showed up in the waiting room and drove to the hospital intoxicated with an infant.

Doc. 33-10 at 5.

Dr. Garcia takes issue with several portions of the affidavit. She asserts that, contrary to the representations in the affidavit, evidence shows that R.E. did not undergo lifesaving measures, his vital signs were not elevated, he did not drown, almost drown, or pass out, and he was not left unsupervised in Kalahari's hot tub for 30 minutes. Doc. 32

12

at 13; Doc. 33 at 9–10. According to Dr. Garcia, R.E. wore a life vest, and was supervised and present in the hot tub with over 40 individuals, including his sisters. Doc. 33 at 3, 9–10. In seeking summary judgment, the Defendants cite competing evidence that purportedly corroborates Officer Rzeszewski's disputed representations about R.E., including Dr. Garcia's testimony, a Pocono Mountain Regional Police Incident Report form, an affidavit from one of Kalahari's medical staff, and medical records of R.E.'s treatment taken by Pocono Mountain Regional EMS. Doc. 26 at 14–15; Doc. 27 at 2, 5–7.

Dr. Garcia also asserts that, contrary to the statements in Officer Rzeszewski's affidavit, she was not "disruptive" with EMS and she did not advocate against R.E. going to the hospital. Doc. 33 at 10. Instead, she avers that she assisted in evaluating R.E., offered to drive R.E. to the hospital in lieu of using an ambulance, specifically stated to EMS that she did not object to R.E. going to the hospital if another physician assessed him, and ultimately agreed to EMS taking R.E. to the hospital via ambulance. *Id.* Again, the Defendants leverage competing evidence that supports Officer Rzeszewski's view of the events, including her statement, Dr. Garcia's testimony, a Pocono Mountain Regional Police

13

Incident Report form, and an affidavit sworn by one of Kalahari's medical staff. Doc. 26 at 14–15; Doc. 27 at 3, 5–8.

Dr. Garcia vigorously contests her alleged intoxication, highlighting Officer Rzeszewski's testimony that, although surveillance footage led her to suspect that Dr. Garcia had an alcoholic beverage, Officer Rzeszewski had "no idea" how much alcohol Dr. Garcia consumed. Doc. 33 at 10. Dr. Garcia also stresses that, despite Officer Rzeszewski having the opportunity to ask Dr. Garcia for a blood draw, and despite Officer Rzeszewski's alleged proficiency in administering sobriety tests, neither metric occurred. *Id.* Finally, Dr. Garcia leverages testimony by Tristin Largey that Dr. Garcia never appeared intoxicated. *Id.* at 11. In opposition, the Defendants again cite competing evidence supporting Officer Rzeszewski's allegations of intoxication. Doc. 26 at 14–15; Doc. 27 at 2–3, 5–8.

On December 13, 2021, the Magisterial District Court issued an arrest warrant for Dr. Garcia, pursuant to the criminal charges. Doc. 33-14 at 6. On December 22, 2021, Dr. Garcia was arraigned and released on unsecured bail of $10,000, and required to submit to fingerprinting. *Id.*; Docs. 28-8 at 7; 32 at 23. On February 17, 2022,

14

following a preliminary hearing held before Magisterial District Court Judge Ronald W. Swank, Judge Swank found that the Commonwealth failed to establish probable cause, and dismissed all charges against Dr. Garcia. Doc. 27 at 5; Doc. 32 at 7; Doc. 33-14 at 6.

Soon thereafter, Dr. Garcia was charged a second time with the same offenses. Doc. 27 at 5; Doc. 32 at 7; Doc. 33-13 at 2–3. On June 14, 2022, Magisterial District Judge Michael R. Muth held a second preliminary hearing, found that the Commonwealth failed to establish probable cause, and again dismissed all charges against Dr. Garcia. Docs. 33-13 at 2–6; 33-15 at 2.

## III.  Discussion

### A.  Motion for Summary Judgment Standard

Summary judgment is appropriate only when record materials, including but not limited to, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007); Fed. R. Civ. P. 56(a), (c)(1)(A). In determining whether a genuine issue of material fact exists,

the court must view the evidence "in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." *Wishkin*, 476 F.3d at 184.

A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material only if it "might affect the outcome of the suit under the governing law . . . ." *Id.* But "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record], ... which it believes demonstrate the absence of a genuine issue of material fact." *Id.* " '[T]he non-moving party must [then] oppose the motion and, in doing so, may not rest upon the mere allegations or denials of his pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.' "

16

*Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Even when the movant contends that the non-movant failed to produce sufficient evidence to prevail on a claim at trial, the movant must still satisfy the initial burden of informing the court of the basis for its motion. *Celotex Corp.*, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion[.]"). This means that "[w]here the moving party does not have the burden of proof on the relevant issues," and they have pinpointed in their motion "deficiencies in the opponent's evidence" sufficient to show no reasonable jury could return a verdict for the non-movant, they are entitled to "judgment as a matter of law." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990).

## B.   False Arrest Claim

The Defendants contend that, because Officer Rzeszewski had probable cause to arrest Dr. Garcia, summary judgment should be granted on her false arrest claim. Doc. 26 at 11–15. In response, Dr.

Garcia responds that Officer Rzeszewski did not have probable cause, or, alternatively, that the issue remains a disputed issue of material fact. Doc. 33 at 8–9. As a review of the relevant evidence of record confirms that the existence of probable cause remains hotly contested, the Court cannot grant summary judgment as a matter of law.

False arrest claims under Section 1983 require a plaintiff to establish "(1) that there was an arrest; and (2) that the arrest was made without probable cause." *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012). The Defendants conceded at oral argument that Dr. Garcia was arrested, leaving only the probable cause element in dispute. Thus, under the circumstances, "summary judgment . . . is proper only if no reasonable juror could find a lack of probable cause for any of the charged crimes." *Harvard v. Cesnalis*, 973 F.3d 190, 199 (3d Cir. 2020).

"Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)). In practical terms, this means that, "when the facts and circumstances within the arresting officer's knowledge are sufficient in

18

themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested[,]" an officer has probable cause to arrest someone. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995). Yet, an arresting officer's probable cause calculus "must consider plainly exculpatory evidence in addition to inculpatory evidence." *Harvard*, 973 F.3d at 200. This continues to be true " 'even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.' " *Id.* (quoting *Wilson*, 212 F.3d at 790).

A plaintiff may challenge probable cause in an affidavit or arrest warrant "by showing (1) an officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood in applying for a warrant'; and (2) the statements or omissions were 'material, or necessary, to the finding of probable cause.' " *Alburg v. Jones*, 784 F. Supp. 3d 775, 790 (E.D. Pa. 2025) (alterations in original) (quoting *Wilson*, 212 F.3d at 786–87). "An omission is made with reckless disregard if the officer withholds something that 'any reasonable person' would consider " 'the kind of thing[ ] the judge would wish to know.' " *Id.* (alteration in original)

19

(quoting *Wilson*, 212 F.3d at 788). Unsurprisingly, exculpatory information is material or necessary to the finding of probable cause. *Id.*

Functionally, assessment of probable cause at the summary judgment stage is "based upon the 'totality-of-the-circumstances' available to the arresting officer," *Harvard*, 973 F.3d at 200, but "considered in their totality in the light most favorable to the nonmoving party." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016). However, because "[t]his totality-of-the-circumstances inquiry is 'necessarily fact-intensive' . . . 'it will usually be appropriate for a jury to determine whether probable cause existed.' " *Id.* (quoting *Dempsey*, 834 F.3d at 468). As such, it "is inappropriate for a court to grant a defendant officer's motion for summary judgment . . . if there are underlying factual disputes bearing on the issue [of probable cause] or if 'reasonable minds could differ' on whether he had probable cause for the institution of the criminal proceedings based on the information available to him." *Halsey v. Pfeiffer*, 750 F.3d 273, 300 (3d Cir. 2014) (first alteration in original) (quoting *Deary v. Three Un–Named Police Officers*, 746 F.2d 185, 192 (3d Cir. 1984)).

Here, the probable cause analysis must be undertaken on a "crime-by-crime basis." *Harvard*, 973 F.3d at 200; *Alburg*, 784 F. Supp. 3d at 790. First, Dr. Garcia was charged under 18 Pa. C.S. § 4304(a)(1), for allegedly endangering the welfare of R.E. Doc. 33-10 at 4. Section 4304(a)(1) provides, in relevant part, that '[a] parent, guardian, or other person supervising the welfare of a child under 18 years of age . . . commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.' " *Commonwealth v. Howard*, 257 A.3d 1217, 1222 (Pa. 2021) (alteration in original) (quoting 18 Pa. C.S. § 4304(a)(1)).

For the *actus reus* element of section 4304(a)(1), it must be proven that "the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare." *Com. v. Bryant*, 57 A.3d 191, 197 (Pa. Super. Ct. 2012). For the *mens rea* element, there must be sufficient proof that the accused was "aware of the nature of his conduct and the certainty with which the conduct will" place a child "in a perilous or dangerous situation." *Howard*, 257 A.3d at 1226–27 (emphasis omitted) (quoting *Com. v. Moser*, 549 A.2d 76, 79 (Pa. 1988)).

21

Second, Dr. Garcia was charged under 18 Pa. C.S. § 2705 for recklessly endangering another person. Doc. 33-10 at 4. "[A] person is guilty of recklessly endangering another person if he 'recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.' " *Harvard*, 973 F.3d at 200 (quoting 18 Pa. C.S. § 2705). "Thus, the crime requires (1) a *mens rea* [of] recklessness, (2) an *actus reus* [of] some 'conduct,' (3) causation 'which places,' and (4) the achievement of a particular result[ing] 'danger,' to another person, of death or serious bodily injury." *Com. v. Reynolds*, 835 A.2d 720, 727 (Pa. Super. Ct. 2003) (emphases added). "Recklessness" in this context is defined as "a conscious disregard of a known risk of death or great bodily harm to another person[.]" *Id.*

Here, the parties dispute several material facts germane to the determination of whether Officer Rzeszewski had probable cause to charge Dr. Garcia with either crime. Beginning with the question of whether R.E. was unsupervised, viewing the evidence and facts in the light most favorable to Dr. Garcia, a reasonable juror could reach either conclusion. Although the parties agree that R.E. was not within Dr. Garcia's immediate vicinity or line of sight while he was in the hot tub,

22

she refutes knowledge of any posted signs limiting access to the hot tubs by children R.E.'s age, or for limited durations. Moreover, Dr. Garcia produced evidence that R.E. was wearing a life-vest during his time at the waterpark, accompanied by his older sisters, and surrounded by 40 adults while in the hot tub. *See* Doc. 33-7 at 16–18, 32; Doc. 33-12 at 57–59. Determining whether those circumstances placed R.E. in a dangerous situation is an issue appropriate for the factfinder, and goes directly to the elements of the offenses underlying the probable cause analysis.

With respect to the severity of R.E.'s condition, a reasonable juror could find for either party. While Dr. Garcia agrees that R.E. was extricated from the hot tub for a medical event, she disagrees about the nature, and seriousness, of this precipitating episode. She contends that, rather than pass out, R.E. fell asleep, and produced evidence in support of her position, in the form of EMS records and testimony. *See* Doc. 33-6 at 34; Doc. 33-7 at 29; Doc. 33-12 at 32; Doc. 33-20 at 2–3. In light of the conflicting evidence and viewpoints on this issue, deciding the severity of R.E.'s medical episode, which bears on the elements of the offenses and corresponding probable cause analysis, must be left to

a factfinder. Likewise, whether Dr. Garcia was disruptive with EMS personnel is an issue for the factfinder. Although Dr. Garcia agrees that she expressed a difference of opinion regarding R.E.'s condition to EMS personnel, she contests her depiction as disruptive, and instead contends that she participated in R.E.'s evaluation. *See* Doc. 33-6 at 16–17.

The parties' vigorous dispute over whether Dr. Garcia appeared intoxicated is a question that also must be determined by a factfinder, and that bears directly on the existence of probable cause. Although the parties agree that Dr. Garcia drank an alcoholic beverage several hours before R.E.'s ordeal, she denies being or appearing intoxicated during the events at issue, and produced testimony and other record evidence in support of her position. *See* Doc. 33-7 at 14, 19, 21; Doc. 33-9 at 2; Doc. 33-12 at 56.

Those disputes all bear on the determination of whether Officer Rzeszewski's affidavit of probable cause omitted, falsified, or altered relevant facts. For example, the affidavit omits R.E.'s use of a life vest, and that R.E. was surrounded by 40 adults while in the hot tub. Doc. 33-10 at 4. And although Officer Rzeszewski acknowledges that R.E.

24

was accompanied by his sisters in the hot tub, the affidavit also states that "R.E. was in the hot tub by himself for approximately 30 minutes." Doc. 33-10 at 4. The affidavit also depicts Dr. Garcia as "slurring her speech and [] zoned out," as being uncooperative and interfering with EMS personnel, and claims that she "drove to the hospital intoxicated with an infant." *Id.*

Accordingly, "reasonable minds could differ on whether [Rzeszewski] had probable cause for the institution of the criminal proceedings" under 18 Pa. C.S. §§ 4304(a)(1) and 2705. *Halsey*, 750 F.3d at 300 (internal quotation omitted). Summary judgment on Count II of the complaint, charging false arrest, is denied.

## C.    Malicious Prosecution Claim

The parties raise a near-identical dispute concerning Dr. Garcia's malicious prosecution claim, warranting an equal outcome at this stage of the litigation. "To prove malicious prosecution under section 1983, a plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to

25

justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003).

Although a prosecutor is typically considered the party to initiate charges under the first element, "an officer can fulfill this element by filing an affidavit of probable cause." *Thompson v. City of Williamsport*, 2023 WL 8005306, at *5 (M.D. Pa. 2023) (citing *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000); and *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000)). Here, the parties neither dispute that Officer Rzeszewski initiated a criminal proceeding, nor that it ended in Dr. Garcia's favor. *See Thompson v. Clark*, 596 U.S. 36, 49 (2022) ("In sum, we hold that a Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence. A plaintiff need only show that the criminal prosecution ended without a conviction.").

Although the parties spent most of their brief contesting whether Dr. Garcia was seized, the Defendants conceded this element during oral argument. Thus, the remaining dispute arises only out of whether

26

Officer Rzeszewski filed charges without probable cause, and acted maliciously or for a purpose other than bringing Dr. Garcia to justice by including alleged falsehoods, omissions, and factual distortions in the affidavit of probable cause. "Malice may be inferred from the absence of probable cause." *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993).

Accordingly, for the reasons detailed above in the Court's analysis of Dr. Garcia's false arrest claim, disputed issues of fact concerning the existence of probable cause and Officer Rzeszewski's intent mandate denying summary judgment on Count I of the complaint, charging malicious prosecution.

### D.   Qualified Immunity

The Defendants contend that, because Officer Rzeszewski had probable cause to charge and arrest Dr. Garcia, and because no clearly established rights are at issue, Officer Rzeszewski is entitled to qualified immunity. Doc. 26 at 21–28. In opposition, Dr. Garcia contends that, because Officer Rzeszewski did not have probable cause to file charges, and because Dr. Garcia had a clearly established right to be free from arrest and prosecution absent probable cause, qualified immunity does not protect Officer Rzeszewski. Doc. 33 at 16–17. As the

parties' contentions again hinge on their pervasive dispute over the existence of probable cause, the Court declines to grant summary judgment on the basis of qualified immunity at this juncture.

Qualified immunity "protect[s] officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To that end, the doctrine "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quotation omitted) (first quoting *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021); and then citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Third Circuit "courts assessing a claim of qualified immunity must answer two questions." *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 716 (3d Cir. 2018). The first inquiry is "whether the plaintiff

sufficiently alleged a right had been violated"—in other words, a Rule 12(b)(6) analysis. *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (citing *Williams v. Sec'y Pa. Dep't of Corrs.*, 848 F.3d 549, 557 (3d Cir. 2017)). The second question is "whether that right was clearly established when it was allegedly violated to the extent 'that it would have been clear to a reasonable person that his conduct was unlawful.' " *Id.* (quoting *Williams*, 848 F.3d at 557). "If the answer is yes to both questions, the officer is not entitled to qualified immunity." *Alburg*, 784 F. Supp.3d at 796.

Qualified immunity is an affirmative defense and the burden of proving the prerequisites for its application rests with the defendant. *Thomas v. Independence Twp.*, 463 F.3d 285, 292 (3d Cir. 2006). "The issue of qualified immunity is generally a question of law, although a genuine issue of material fact will preclude summary judgment on qualified immunity." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009). In deciding qualified immunity questions at summary judgment, a court must view the facts in the light most favorable to the plaintiff. *Id.* The Court "ha[s] discretion to address either inquiry first." *Sauers*, 905 F.3d at 716 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Regarding the second qualified immunity prong, a "right is clearly established when the law is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* at 719 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "In undertaking that task, [the Court is] guided by the Supreme Court's repeated instructions to do so in light of the particular facts of the case at hand." *Id.* at 716–17 (citations omitted). Put differently, the Court's inquiry must refrain from "a broad general proposition." *Clark*, 55 F.4th at 719 (quotations omitted). This, however, "does not require a prior precedent with indistinguishable facts[.]" *Sauers*, 905 F.3d at 719. Rather, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Existing precedent places a constitutional question beyond debate and defeats qualified immunity under three circumstances. First, when the precedent is a "controlling authority" from the Supreme Court or Third Circuit Court of Appeals. *Id.* Second, when a "robust consensus of cases of persuasive authority" on the question exists within the boundaries of the Third Circuit Court of Appeals. *Id.* (quotations

30

omitted). And third, when a "robust consensus of persuasive authority[,]" outside the Third Circuit Court of Appeals, exists in the "Courts of Appeals" from around the country. *Fields v. City of Philadelphia*, 862 F.3d 353, 361 (3d Cir. 2017).

Although it is the Defendants' burden to establish that Officer Rzeszewski is entitled to qualified immunity, they failed to articulate the right implicated by Dr. Garcia's allegations. Doc. 26 at 23–28. Indeed, the Defendants state simply that "the arrest of Plaintiff does not constitute a 'clearly established' violation of the Fourth Amendment," and failed to offer greater clarity at oral argument. *Id.* Dr. Garcia frames the right at issue as follows: the right to be free from arrest and prosecution absent probable cause. Doc. 33 at 17. However, because the Court must refrain from using "broad general proposition[s]" like the one offered by Dr. Garcia, *Clark*, 55 F.4th at 719, it will instead frame the right in the context of the specific allegations in this action: the right to be free from an arrest and prosecution based on an affidavit of probable cause that omitted material facts and included false and misleading representations, when a complete and

accurate affidavit would have militated against a finding of probable cause.

Controlling authority dictates that this right was clearly established at the time of the incidents giving rise to this action. It has been long settled that omitting exculpatory and material information in an application for a warrant, and any subsequent prosecution stemming from that deficient application, violates the Fourth Amendment. *See Lippay*, 996 F.2d at 1504 ("[Plaintiff] had to prove that [defendant] acted with reckless disregard for the truth or falsified information contained in the affidavits used to initiate the criminal proceedings. If a police officer submits an affidavit containing statements he knows to be false or would know are false if he had not recklessly disregarded the truth, the officer obviously failed to observe a right that was clearly established."); *Sherwood*, 113 F.3d at 399 (holding that a police officer is not entitled to qualified immunity if he "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood in applying for a warrant" and "such statements or omissions [were] material, or necessary, to the finding of probable cause."); *Wilson*, 212 F.3d at 786–87 ("[A] plaintiff

32

may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause.") (internal quotations omitted); *Fallen v. McEnroe*, 2025 WL 32816, at *2 (3d Cir. 2025) ("[Plaintiff] would ordinarily be entitled to qualified immunity unless 'the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood in applying for a warrant' and 'such statements or omissions [were] material, or necessary, to the finding of probable cause.' ") (alterations in original) (quoting *Sherwood*, 113 F.3d at 399).

Thus, when viewing the record in the light most favorable to Dr. Garcia, her Fourth Amendment right to be free from an arrest and prosecution based on a deficient affidavit of probable cause that omitted material facts and included false and misleading representations was

clearly established in 2021, when the circumstances giving rise to this action occurred.

Regarding the first qualified immunity prong, and as detailed above, because a genuine issue of material fact exists with respect to probable cause, it precludes the Court from determining, at this juncture, whether she sufficiently demonstrated a constitutional violation. Indeed, because probable cause is an essential element in Dr. Garcia's false arrest and malicious prosecution claims, its presence or absence is integral to the Court's ability to assess the sufficiency of the alleged constitutional violations here. *Clark*, 55 F.4th at 178; *Estate of Smith*, 318 F.3d at 521; *James*, 700 F.3d at 680. Thus, until the factfinder determines whether Officer Rzeszewski had probable cause to charge Dr. Garcia, the Court cannot fully assess the sufficiency of those claims.

Determining at this stage whether Officer Rzeszewski is entitled to qualified immunity on Dr. Garcia's false arrest and malicious prosecution claims would be premature. *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) ("Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a

34

decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis."); *Giles*, 571 F.3d at 326 ("[A] genuine issue of material fact will preclude summary judgment on qualified immunity."); *Barasky v. Dent*, 2025 WL 3678888, at *12 (M.D. Pa. 2025) ("Determining qualified immunity at this [summary judgment] stage would be premature due to several disputes of material fact."); *Contreras v. Conrad*, 2020 WL 2193429, at *9 (M.D. Pa. 2020) (finding that genuine issues of material fact "preclude the entry of summary judgment as to Defendants' qualified immunity argument."). Accordingly, the Defendants' motion for summary judgment on the basis of qualified immunity is denied, without prejudice.

### E.   Abuse of Process Claim

The Defendants contend that no record evidence can establish that Officer Rzeszewski abused legal process after initiation of Dr. Garcia's prosecution. Doc. 26 at 20–21. Although Dr. Garcia did not respond to this contention during briefing, she averred during oral argument that Officer Rzeszewski abused legal process by initiating a second set of criminal charges after the county court dismissed the first

35

prosecution, and by prompting an investigation by CYS. Neither of those positions saves the claim from summary judgment.

"An abuse of process occurs when a party employs legal process against another primarily to accomplish a purpose for which it was not designed." *Napier v. City of New Castle*, 407 F. App'x 578, 582 (3d Cir. 2010) (citing *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 307 (3d Cir. 2003)). " 'In contrast to a section 1983 claim for malicious prosecution, a section 1983 claim for malicious abuse of process lies where prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by the law.' " *Id.* (quoting *Rose v. Bartle*, 871 F.2d 331, 350 n.17 (3d Cir. 1989)) (some internal quotations omitted). Critically, "[a]buse of process is not concerned with what *led* to the prosecution–rather, the plaintiff must establish that the defendant perverted the proceedings *after* they were initiated." *Forlina v. Doe*, 2019 WL 5188400, at *5 (E.D. Pa. 2019).

Dr. Garcia alleges that "Rzeszewski utilized the criminal legal process against [her] to charge her with crimes wholly unsupported by probable cause." Doc. 1 at 25. Dr. Garcia further alleges that "Rzeszewski's purpose [in utilizing the criminal justice process] was to

36

unlawfully arrest and charge [her] in an attempt to intimidate, harass, annoy, and alarm her." *Id.* at 25–26. Even if record evidence corroborated those allegations, it would fall short of establishing an abuse of process claim. The conduct on which Dr. Garcia's claim is premised concerns Officer Rzeszewski's initiation of charges, not an abuse of legal process occurring thereafter.

Dr. Garcia's reliance on Officer Rzeszewski's reinitiation of charges without offering new evidence does not salvage the claim. Even if the second set of charges arose out of "bad intentions," a viable abuse of process claim does not exist when the defendant "merely carries out the process to its authorized conclusion." *Douris v. Schweiker*, 229 F. Supp. 2d 391, 404 (E.D. Pa. 2002), *aff'd sub nom. Douris v. Rendell*, 100 F. App'x. 126 (3d Cir. 2004); *Zerby v. Waltz*, 2017 WL 386616, at *10 (M.D. Pa. 2017). And Dr. Garcia offers no rationale for how prompting a CYS investigation constitutes an abuse of legal process; a shortcoming that she effectively conceded at oral argument.

As no record evidence shows that Officer Rzeszewski perverted the process after the initiation of charges, or after the reinitiation of charges, the claim necessarily fails. *Forlina*, 2019 WL at *6; *Talbert v.*

37

*Ciglar*, 2019 WL 653219, at *5 (E.D. Pa. 2019) (concluding that plaintiff failed to allege abuse of process claim where he claimed merely that defendant improperly initiated proceedings); *Ference v. Twp. of Hamilton*, 538 F. Supp. 2d 785, 798 (D.N.J. 2008) ("To establish [an abuse of process] claim, there must be some proof of a definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process."). Accordingly, summary judgment on Count III, claiming abuse of process, is granted.

### F.    Failure to Train *Monell* Claim

The parties dispute whether any record evidence shows that Pocono Mountain failed to train Officer Rzeszewski. Docs. 26 at 30–32; 33 at 19–20. As the evidence fails to show that Pocono Mountain was deliberately indifferent to a specific training need, summary judgment is warranted on the *Monell* claim.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Instead, Section 1983 claims against municipalities may proceed in two ways. First, "[a] plaintiff may put forth that an unconstitutional policy or custom of the municipality led

38

to his or her injuries[.]" *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). Second, and relevant for current purposes, a plaintiff may allege that their injuries "were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice[.]' " *Id.* (quoting *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)). "The latter avenue arose in the failure-to-train context, but applies to other failures and inadequacies by municipalities, including those related to supervision and discipline of its police officers." *Id.* (citing *Estate of Roman*, 914 F.3d at 798–99).

Here, Dr. Garcia acknowledged at oral argument that her *Monell* claim was premised on a deliberate indifference failure to train theory, not on an alleged policy and custom. Proving a municipality's deliberate indifference is "demanding," and requires a plaintiff to demonstrate: "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* at 106 (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)). In the failure to train context, this means that the plaintiff

39

"needs to show that a defendant was on notice that, absent additional specialized training, [the injury] was so predictable[,] that failing to train the municipal employees amounted to conscious disregard for the constitutional rights of citizens." *Diaz v. City of Philadelphia*, 670 F. Supp. 3d 174, 185 (E.D. Pa. 2023) (cleaned up).

"Ordinarily, this means that a plaintiff must show that '[a] pattern of similar constitutional violations' put the city on notice that, by failing to act, it was being deliberately indifferent to [citizen]s' rights. *Hightower v. City of Philadelphia*, 130 F.4th 352, 357 (3d Cir. 2025) (first alteration in original) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). Additionally, the alleged failure to conduct specialized training must have a close causal relationship with the alleged constitutional injury, because "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989); *Kelley v. Reyes*, 2025 WL 618207, at *21 (D.N.J. 2025).

40

In support of her claim, Dr. Garcia first submits that she identified and deposed a policymaker at Pocono Mountain, Chief Christopher Wagner. Doc. 33 at 18. Second, she asserts that "Chief Wagner knew of Defendant Rzeszewski's dishonesty[,]" because Officer Rzeszewski "previously made criminal allegations of misconduct against one of her colleagues, which was determined to be unfounded." *Id.* at 19–20. In further support of her contention that Chief Wagner was aware of Officer Rzeszewski's alleged dishonesty, Dr. Garcia raised at oral argument a matter previously before the Court, *Barnello v. Pocono Mountain Reg'l Police Comm'n*, 2024 WL 3794676 (M.D. Pa. 2024), that involved Officer Rzeszewski and accusations of faulty probable cause. Doc. 1 at 28–29. Thus, Dr. Garcia concludes that the "Defendant Commission knew that Defendant Rzeszewski was ill-equipped, if not incapable, to carry out her duties as law enforcement without infringing on citizens' constitutional rights, yet placed her in a position to do exactly that despite her obvious need for training." *Id.* at 20.

The scant evidence supporting those allegations falls short of the showing required to survive summary judgment. Although the record evidence establishes that by 2023, Chief Wagner was aware of Officer

41

Rzeszewski's dubious misconduct allegations (Doc. 33-8 at 5–6), this was more than a year after the 2021 events at issue in this action—a temporal dissonance that Dr. Garcia conceded at oral argument. Moreover, record evidence fails to establish that, by 2021, Chief Wagner had reason to be aware of the facts at issue in *Barnello*, a case initiated in 2023. 2024 WL 3794676 at *3.

Even if Chief Wagner had known about either of those incidents prior to late 2021, neither circumstance would logically give rise to a need to provide Officer Rzeszewski with specialized training for the Fourth Amendment constitutional injuries alleged in this action. Unlike the injuries alleged here, Officer Rzeszewski's misconduct allegations concerned alleged sexual assault, and the facts in *Barnello* involved, among other things, a preliminary hearing "where the magisterial district court judge found that there was a *prima facie* case to hold the charges over for trial." 2024 WL 3794676, at *5; *Diaz*, 670 F. Supp.3d at 185. And even absent those dissimilarities, Dr. Garcia cannot establish a pattern premised on just two previous occurrences. *Hightower*, 130 F.4th at 357. Moreover, Dr. Garcia does not identify a particular

requisite training, the absence of which can be traced directly to her injury. *Id.*; *City of Canton, Ohio*, 489 U.S. at 392.

Thus, the evidence produced by Dr. Garcia falls well short of establishing a deliberate indifference failure to train claim, even when viewing it in the light most favorable to the plaintiff. Accordingly, summary judgment is granted on the Count IV *Monell* claim.

## G.    Intentional Infliction of Emotional Distress Claim

The Defendants contend that Dr. Garcia failed to offer any medical evidence establishing injury arising out of her claimed emotional distress, or any evidence that Officer Rzeszewski engaged in extreme or outrageous conduct. Doc. 26 at 32. Dr. Garcia responds that Officer Rzeszewski's conduct in authoring the affidavit of probable cause and initiating charges suffices to establish the claim, Doc. 33 at 20–21, and further averred at oral argument that a reasonable juror could assume that those actions would cause emotional damage. As the record is bereft of evidence showing treatment for emotional distress or physical harm, summary judgment is warranted.

To succeed on a claim of intentional infliction of emotional distress under Pennsylvania law, a plaintiff must show " '(1) the conduct [of the

43

defendant] must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; [and] (4) the distress must be severe.'" *Smith v. RB Distribution, Inc.*, 515 F. Supp.3d 311, 315 (E.D. Pa. 2021) (alterations in original) (quoting *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. Ct. 1997), *aff'd* 720 A.2d 745 (Pa. 1998)). "Pennsylvania maintains a high bar for what constitutes extreme and outrageous conduct[.]" *Zucal v. Cnty. of Lehigh*, 760 F. Supp.3d 290, 305 (E.D. Pa. 2024). "In addition, 'a plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct.'" *Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010) (quoting *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)).

Dr. Garcia focuses on caselaw in this circuit holding that "[k]nowingly instituting false criminal charges c[an] . . . constitute outrageous conduct." *Kovalev v. City of Philadelphia*, 2017 WL 770945, at *11 (E.D. Pa. 2017), *aff'd*, 775 F. App'x 72 (3d Cir. 2019). But even assuming that those circumstances exist here, the claim still fails, as Dr. Garcia must also prove that such actions caused her severe emotional distress, and resulting physical harm. *Smith*, 515 F. Supp. 3d at 315; *Reedy*, 615 F.3d at 231. However, as Dr. Garcia conceded at oral

44

argument, the record does not contain evidence establishing that she was treated for either emotional distress or physical harm. And a jury's potential assumptions do not salvage the claim. *See, e.g., Galullo v. Fed. Exp. Corp.*, 937 F. Supp. 392, 398 (E.D. Pa. 1996) ("Pennsylvania courts have long held that a jury is not permitted to speculate or guess since conjecture, guess[,] or suspicion do not amount to proof.").

Absent that requisite evidence, summary judgment on the Count V intentional infliction of emotional distress claim is granted. As no other surviving claims are advanced against Pocono Mountain, that defendant will be terminated from this action.

## IV.   Conclusion

For the reasons set forth above, the Court will deny in part, and grant in part, the motion for summary judgment. A separate order shall be issued.

Date: March 30, 2026

*s/ Phillip J. Caraballo*
Phillip J. Caraballo
United States Magistrate Judge

45